# IN THE SUPREME COURT OF CALIFORNIA

TAMELIN STONE et al.,
Plaintiffs and Appellants,

v.

ALAMEDA HEALTH SYSTEM,
Defendant and Respondent.

S279137

First Appellate District, Division Five
A164021

Alameda County Superior Court
RG21092734

---

August 15, 2024

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Segal* concurred.

---

_____

\*     Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

STONE v. ALAMEDA HEALTH SYSTEM

S279137

Opinion of the Court by Corrigan, J.

This case concerns whether a hospital authority created by a county Board of Supervisors and authorized by the Legislature to manage the county's public health facilities may be held liable for wage and hour violations and civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.; PAGA).[1] We conclude the Legislature intended to exempt public employers such as the hospital authority from Labor Code provisions governing meal and rest breaks (§§ 226.7, 512) and related statutes governing the full and timely payment of wages (see § 220, subd. (b)).[2] We further conclude public entities are not subject to PAGA penalties for the violations alleged here. Because the Court of Appeal reached different conclusions, we reverse its judgment.

## I. BACKGROUND

All California counties have a mandatory duty to provide medical care for their indigent residents. (Welf. & Inst. Code, § 17000; *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991; *County of San Diego v. State of California* (1997) 15 Cal.4th 68,

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

[2] As we will discuss (*post*, at pp. 14–15), the Legislature recently amended some of these provisions. (See Stats. 2022, ch. 845, § 2, enacting Sen. Bill No. 1334 (2021–2022 Reg. Sess.).) Those amendments are not at issue here.

1

104–105.) After years of managing a medical center for this purpose, the Alameda County Board of Supervisors (Board of Supervisors) determined that transferring governance of the center to a hospital authority would "improve the efficiency, effectiveness, and economy of the community health services provided" and would be "the best way to fulfill its commitment to the medically indigent, special needs, and general populations of" the county. (Health & Saf. Code, § 101850, subd. (a).) The Board of Supervisors sought the legislative authorization to do so. In 1996 the Legislature enacted Health and Safety Code, section 101850 (hereafter sometimes referred to as "the enabling statute"). (Stats. 1996, ch. 816, § 1, p. 4277.)[3] This statute authorized the establishment of defendant Alameda Health System (AHS) as a "separate public agency" (Health & Saf. Code, § 101850, subd. (a)(2)(C); see *id.*, subd. (a)(2)(D)) "strictly and exclusively dedicated to the management, administration, and control of the medical center" (*id.*, subd. (b)).

Plaintiffs worked at Highland Hospital, a facility operated by AHS. Tamelin Stone was a medical assistant and Amanda

---

[3] The Legislature found and declared that "the adoption . . . of a special authority is required" because "there is no general law under which [this hospital] authority could be formed." (Health & Saf. Code, § 101850, subd. (a)(1).) " 'Hospital authority,' " as defined in the enabling statute, "means the separate public agency established by the Board of Supervisors of Alameda County to manage, administer, and control the Alameda Health System." (*Id.*, subd. (a)(2)(C).) The Board of Supervisors adopts the hospital authority's bylaws and must approve any changes to them. (*Id.*, subd. (e).) The statute directs the hospital authority to "apply as a public agency" for licenses to provide health care. (*Id.*, subd. (g).)

Kunwar was a licensed vocational nurse. In their wage and hour suit against AHS, plaintiffs alleged these positions were subject to requirements of the Labor Code and wage orders, in particular Industrial Wage Commission (IWC) wage order No. 5-2001 (Cal. Code Regs., tit. 8, § 11050; hereafter Wage Order No. 5). The operative complaint alleged that AHS frequently denied or discouraged the taking of meal and rest breaks and "automatically deducted ½ hour from each workday" even when meal periods were not taken. Plaintiffs asserted seven class action claims: (1) failure to provide off-duty meal periods (§§ 226.7, 512); (2) failure to provide off-duty rest breaks (§ 226.7); (3) failure to keep accurate payroll records (§§ 1174, 1174.5, 1175); (4) failure to provide accurate itemized wage statements (§§ 226, 226.3); (5) unlawful failure to pay wages (§§ 204, 222, 223, 225.5, 218.6, 218.5, 510, 1194, 1194.2, 1198); (6) failure to timely pay wages (§§ 204, 210, 222, 223, 225.5, 218.6, 218.5); and (7) civil penalties for these violations under PAGA (§ 2698 et seq.).[4]

AHS demurred on the ground that it was a public entity not subject to suit for the Labor Code violations asserted. The demurrer was sustained without leave to amend. Based on *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729 (*Johnson*), the court held that "provisions of the Labor Code apply only to private sector employees unless they are specifically made applicable to public employees." Because it found AHS was a public agency, and because the statutes and

---

[4] The complaint's additional, nonclass claims for discrimination, retaliation, harassment, constructive wrongful termination, and intentional infliction of emotional distress, along with its requests for declaratory and injunctive relief, are not before us in this appeal.

wage order provisions at issue do not mention public employment, the court concluded AHS had no liability. The court also dismissed the PAGA claim. It reasoned that public entities like AHS are not " 'person[s]' " subject to PAGA penalties (§§ 18, 2699, subd. (b)); the PAGA claim here derived from Labor Code violations that had been rejected; and, because PAGA penalties are punitive in nature, they are not available against public entities (Gov. Code, § 818).

The Court of Appeal reversed in part, reasoning as follows. Construing the enabling statute, rather than the Labor Code provisions themselves, the court discerned no legislative intent to exempt AHS from the meal and rest period and payroll requirements underlying plaintiffs' first three causes of action. (*Stone v. Alameda Health System* (2023) 88 Cal.App.5th 84, 93–94 (*Stone*).) It distinguished contrary authority as involving state agency defendants, whereas the enabling statute indicates that AHS "shall not be considered to be an agency, division, or department of the county." (Health & Saf. Code, § 101850, subd. (j); see *Stone*, at pp. 93–94.) Subjecting AHS to Labor Code requirements would not infringe any sovereign governmental powers, the court reasoned, because AHS possessed no powers that could not as easily be wielded by a private institution. (*Stone*, at pp. 94–95.) The court held the fourth cause of action was properly dismissed under an exemption in the wage statements statute because AHS "is a 'governmental entity' of some kind" (*id.* at p. 97; see § 226, subd. (a)),[5] but it concluded AHS *was* subject to liability under

---

[5]    Plaintiffs now suggest this ruling was incorrect. We do not address the argument, however, because it was not raised in the

the wage payment statutes referenced in the fifth and sixth causes of action (*Stone*, at pp. 95–96). Relying on a similar analysis in *Gateway Community Charters v. Spiess* (2017) 9 Cal.App.5th 499 (*Gateway*), the court reasoned AHS was not exempt from these obligations as a "municipal corporation" (§ 220, subd. (b)) because it lacked such governmental authority as the power to impose taxes or to acquire property through eminent domain. (*Stone*, at pp. 95–96.) Finally, the court determined AHS was subject to PAGA penalties as alleged in the seventh cause of action. Although it agreed AHS is not a "person" subject to default penalties where no statutory penalty is specified (see § 2699, subds. (b), (f); see also § 18), the court held AHS was nevertheless subject to penalties for violating statutes that do provide for specific penalties. (*Stone*, at pp. 98–99.) Having concluded such penalties are not punitive in nature, the court determined Government Code section 818 posed no obstacle to their imposition on a public entity. (*Stone*, at p. 99.)

Because this appeal was taken from a dismissal on demurrer, and involves questions of statutory interpretation, our review is de novo. (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 658; *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.)

## II. DISCUSSION

A. *Analytical Framework*

Statutory interpretation questions are guided by familiar principles. "Our fundamental task is to ascertain the

---

petition for review or answer. (See Cal. Rules of Court, rule 8.516(b)(1); *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 916, fn. 5.)

Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. [Citation.] We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment." (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 168.) If the language is clear, " 'its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14.) An administrative agency's "interpretation of a statute 'it enforces is entitled to great weight unless clearly erroneous or unauthorized.' " (*Ibid*.) Considering the remedial nature of statutes governing employees' wages, hours, and working conditions, these provisions are liberally construed to promote worker protection. (*McLean v. State of California* (2016) 1 Cal.5th 615, 622 (*McLean*).)

When construing a statute, courts frequently consult interpretive maxims. "A traditional rule of statutory construction" relevant here "is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute." (*Wells One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192 (*Wells*).) This principle is deeply embedded in our state's jurisprudence. (See *Mayrhofer v. Board of Education* (1891) 89 Cal. 110, 113 (*Mayrhofer*).)

Multiple decisions have applied the rule to interpretations of the Labor Code. (See, e.g., *Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 597–598 (*Allen*); *California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 653 (*California*

*Correctional*); *Johnson, supra,* 174 Cal.App.4th at p. 736; see also 71 Ops.Cal.Atty.Gen. 39, 44 (1988) ["provisions of the Labor Code extending to public employment do so expressly"].) In at least one instance, the Legislature has done so as well. We quoted a Senate committee report on this subject in *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311 when discussing a bill extending whistleblower protection to public employees. After noting the silence of existing whistleblower laws on their applicability to public employment, the report explained: " 'Generally, . . . provisions of the Labor Code apply only to employees in the private sector unless they are specifically made applicable to public employees.' (Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 3486 (1991–1992 Reg. Sess.) as amended Apr. 21, 1992, p. 2.)" (*Campbell,* at p. 330; see also *Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718, 752 (*Stoetzl*) [quoting the same report].)

This interpretive maxim is modified by a caveat, however. The "rule excludes government agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers." (*Regents of University of California v. Superior Court* (1976) 17 Cal.3d 533, 536.) Like the rule, the caveat is well established. Early cases explained that "the state is not bound by general words in a statute" if they "would operate to trench upon [the state's] sovereign rights, injuriously affect its capacity to perform its functions, or establish a right of action against it." (*Miles v. Ryan* (1916) 172 Cal. 205, 207; *Mayrhofer, supra,* 89 Cal. at p. 113.) "Where, however, no impairment of sovereign powers would result, the reason underlying th[e] rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental

bodies even though it used general statutory language only." (*Hoyt v. Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 402.)

As we cautioned in *Wells*, the sovereign powers caveat, like the rule it modifies, "is simply a maxim of statutory construction. While the 'sovereign powers' principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent." (*Wells*, *supra*, 39 Cal.4th at p. 1193.) We must examine "the language, structure, and history of the particular statute[s] before us" to determine whether the Legislature intended to impose their requirements on public employers. (*Ibid.*) Although interpretive maxims may aid in that analysis, the fundamental question is always one of legislative intent. (See *State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1237–1238 [declining to address sovereign powers infringement where legislative intent to exclude public entities from False Claims Act (Gov. Code, § 12650 et seq.) was clear].)

B.   *Public Entity Liability for Meal and Rest Break Violations*

We begin by considering whether the Legislature intended to exclude public entity employers from the meal and rest break obligations at issue here. We then consider whether AHS qualifies as a public entity. Because the statutory language, context, and history provide "positive indicia" of a legislative intent to exclude public employers, resort to interpretive maxims is unnecessary, and we need not address whether application of the laws would invade AHS's sovereign powers.

1. *Legislative Intent To Exclude Public Entity Employers*

a. *Statutory Language*

The Labor Code's meal and rest break obligations are found in sections 226.7 and 512. Section 226.7 provides that "[a]n employer shall not require an employee to work during a meal or rest or recovery period" mandated by statute, regulation, IWC wage order, or other order. (§ 226.7, subd. (b).) Section 512, governing meal periods, mandates: "An employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes." (§ 512, subd. (a).) The applicable IWC wage order is in accord. (See Wage Order No. 5, subd. 11(A).) The relevant rest break requirement is also found in the wage order, which mandates: "Every employer shall authorize and permit all employees to take rest periods . . . ." (Wage Order No. 5, subd. 12(A).) The Labor Code does not define the term "employer" (*McLean*, *supra*, 1 Cal.5th at p. 627), but a definition is found in the wage order. It states: " 'Employer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or other person, employs or exercises control over the wages, hours, or working conditions of any person." (Wage Order No. 5, subd. 2(H).) Section 18, in turn, provides: " 'Person' means any person, association, organization, partnership, business trust, limited liability company, or corporation."[6]

---

[6] Plaintiffs' derivative claim for inaccurate payroll records also turns on the meaning of "person," because section 1174 places its record-keeping obligation on "[e]very *person* employing labor in this state" (italics added).

In summary, the Labor Code and wage order impose meal and rest break obligations on "employers," and, under the relevant wage order, an "employer" must be a "person as defined in Section 18 of the Labor Code." (Wage Order No. 5, subd. 2(H).) Accordingly, section 18's definition of the term "person" is central to resolving the issues here.

Although we have not previously construed section 18, we considered a similar definition of "person" in *Wells*, *supra*, 39 Cal.4th 1164. The False Claims Act states that a " '[p]erson' includes any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust." (Gov. Code, § 12650, subd. (b)(9).) We observed that all the words and phrases used to describe a "person" covered by the act "are those most commonly associated with private individuals and entities" as opposed to public or governmental agencies. (*Wells*, at p. 1190.) As *Wells* noted, a nearly identical list of words and phrases appears in the Labor Code's definition of "person." (See *Wells*, at p. 1191, fn. 14; see also § 18.) Indeed, the Labor Code's definition is more precise, stating that the word person "means" the typically private entities listed (§ 18), whereas under the False Claims Act a person "includes" these entities but may also encompass other entities not listed (Gov. Code, § 12650, subd. (b)(9)). In statutory drafting, the term "includes" is typically one of enlargement, whereas "means" is more restrictive. (See *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 622, fn. 6; *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101.) The wage order's reliance on the term "person," as defined in section 18, therefore communicates that government employers are not subject to the meal and rest break obligations it prescribes.

As we have noted in other contexts, "the Legislature is capable of bringing government entities within the scope of specific legislation when it intends to do so." (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 678.) In contrast to the statutes at issue here, other Labor Code provisions specifically describe their applicability to public employers. For example, a statute within the same chapter as the meal break law (§ 512) declares that "[s]ections 550, 551, 552 and 554 of this chapter [governing maximum consecutive working days] are applicable to cities which are cities and counties and to the officers and employees thereof." (§ 555.) Thus, even within the same chapter, the Legislature has directed that some, *but not all*, wage and hour laws apply to public entities. (See *Johnson*, *supra*, 174 Cal.App.4th at pp. 736–737.) Similarly, the statute mandating paid sick leave defines "employer" for its purposes as "any person employing another under any appointment or contract of hire and includes the state, political subdivisions of the state, and municipalities." (§ 233, subd. (b)(1); see § 245.5, subd. (b)(1).) Likewise, the minimum wage law states, "For purposes of this subdivision, 'employer' includes the state, political subdivisions of the state, and municipalities." (§ 1182.12, subd. (b)(3).) In yet another example, the workers' compensation law specifically defines "employer" to include "[t]he State and every State agency" and "[e]ach county, city, district, and all public and quasi public corporations and public agencies therein." (§ 3300, subds. (a)–(b).) As AHS points out, the worker's compensation law and section 18 were enacted as part of the same legislation. (Stats. 1937, ch. 90, § 18, p. 186; *id.*, § 3300, p. 266.) Thus, within the same session, the Legislature expressly included public employers in section 3300 but not in section 18. Of course, other Labor Code provisions

specifically exclude government employers from their terms (e.g., § 220, subd. (b)), a practice that blunts any inference one might draw from legislative silence. But here, "employer" is defined by reference to section 18, and section 18 is *not* silent about whether government employers are covered; its language affirmatively indicates that they are not.

While section 18's definition of "person" is central to our interpretation of the relevant Labor Code and wage order provisions, this definition by itself is not dispositive. Nevertheless, construing section 18 to exclude public employers from meal and rest break obligations is generally consistent with the text of the applicable wage order. "Nearly a century ago, the Legislature responded to the problem of inadequate wages and poor working conditions by establishing the IWC and delegating to it the authority to investigate various industries and promulgate wage orders fixing for each industry minimum wages, maximum hours of work, and conditions of labor. [Citations.] Pursuant to its 'broad statutory authority' [citation], the IWC in 1916 began issuing industry- and occupation-wide wage orders specifying minimum requirements with respect to wages, hours, and working conditions [citation]." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*).) Because the Legislature has also on occasion enacted statutes addressing these issues, "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC. (*Brinker*, at p. 1026.) IWC wage orders thus bear a quasi-legislative status and "are to be accorded the same dignity as statutes." (*Id.* at p. 1027.)

Wage Order No. 5, which covers hospital workers, states that, unless specifically noted otherwise, "the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district." (Wage Order No. 5, subd. 1(C).) The plain language of the governing wage order thus *expressly excludes* public employers from most of the wage and hour obligations it places on private employers, including meal and rest break obligations. (*Id.*, subds. 11, 12.)

b.    *Legislative History*

Relevant history of the statutes and wage orders also supports a conclusion that the Legislature did not intend for meal and rest break requirements to apply to public employers.

Historically, the IWC wage orders completely exempted government employers from their reach. (*California Correctional, supra*, 188 Cal.App.4th at p. 655.) The version of Wage Order No. 5 issued in 1976 thus stated: "The provisions of this Order shall not apply to employees directly employed by the State or any county, incorporated city or town or other municipal corporation." (Cal. Code Regs., tit. 8, former § 11380 [IWC wage order former No. 5-76, subd. 1(C)].) The IWC's statement as to the basis explained that this exemption "reflect[ed] the Attorney General's advice that the IWC may not issue regulations covering employees of the state and its subdivisions without explicit legislative authorization." (IWC, Statement as to the Basis for Wage Order No. 5-76 subd. 1 (Oct. 18, 1976).)

The IWC eliminated the wage orders' overtime provisions in the late 1990's, but the Legislature repudiated this change by enacting the Eight-Hour-Day Restoration and Workplace

Flexibility Act of 1999 (Stats. 1999, ch. 134, enacting Assem. Bill No. 60 (1999–2000 Reg. Sess.)). (See *Brinker, supra*, 53 Cal.4th at p. 1037; *Johnson, supra*, 174 Cal.App.4th at p. 735.) The bill "repealed five wage orders, including IWC wage order No. 5–98 (Jan. 1, 1998), and required the IWC to review its wage orders and readopt orders conforming to the Legislature's expressed intentions. (§ 517; Stats. 1999, ch. 134, § 21, p. 1829.) It also enacted section 512, which for the first time set out statutory meal period requirements." (*Brinker*, at p. 1045.) Critically, for our purposes, the Legislature did not alter the wage orders' exemption for public employers. On the contrary, newly enacted section 515, subdivision (b) generally affirmed the IWC's ability to "review, retain, or eliminate any exemption from provisions regulating hours of work that was contained in any valid wage order in effect in 1997." With two exceptions in orders concerning agricultural and household occupations, "public employees were expressly exempted from the IWC wage orders in effect in 1997." (*California Correctional, supra*, 188 Cal.App.4th at p. 655.) We presume the Legislature was aware of the preexisting exemption for public employment when it affirmed the IWC's authority to modify the wage orders. (See *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 199.) As a result, its enactment of section 515 is strong evidence that it intended to maintain the exemption.

In 2001, the IWC amended the wage orders to specifically apply certain provisions to government employees. (See *Stoetzl, supra*, 7 Cal.5th at p. 748.) Newly amended subdivision 1(C) of IWC Wage Order No. 5-2001 (Jan. 1, 2001) stated: *"Except as provided in Sections 1, 2, 4, 10, and 20*, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city,

county, or special district." (Italics added.) This provision remains unchanged in the current wage order. (See Wage Order No. 5, subd. 1(C).) The exceptions concern applicability of the order (*id.*, subd. 1), definitions (*id.*, subd. 2), minimum wages (*id.*, subd. 4), meals and lodging provided to employees (*id.*, subd. 10), and penalties (*id.*, subd. 20). Notably, the IWC did not, and has never, altered the government exemption from wage order provisions governing meal periods (*id.*, subd. 11), rest periods (*id.*, subd. 12), overtime (*id.*, subd. 3), or record-keeping (*id.*, subd. 7).

The Legislature's intent to exempt public employers from meal and rest break obligations is further confirmed by its recent enactment of section 512.1. (Stats. 2022, ch. 845, § 2, enacting Sen. Bill No. 1334 (2021–2022 Reg. Sess.).) Effective January 1, 2023, the new statute requires that *public* employers, which it defines as "the state, political subdivisions of the state, counties, municipalities, and the Regents of the University of California" (§ 512.1, subd. (e)(2)), must provide meal and rest periods to all employees who provide or support "direct patient care . . . in a general acute care hospital, clinic, or public health setting" (*id.*, subd. (e)(1)).[7] The enactment of section 512.1 is telling because it indicates the Legislature did not believe public employers were required to provide meal and rest breaks to health care workers under prior law. Legislative history confirms this understanding. A Senate Rules Committee report stated that the bill would "extend[] existing meal and rest period rights and remedies available to private

---

[7] The complaint alleges conduct that occurred before section 512.1's enactment. Plaintiffs do not contend the new statute applies retroactively.

sector employees to [certain health care workers] who are directly employed by specified public sector employers." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1334 (2021–2022 Reg. Sess.) as amended Aug. 25, 2022, p. 1.) The report explained that "existing labor code provisions entitle *private sector* employees to an unpaid 30-minute meal period, as specified, and per existing Industrial Wage Orders, to a 10-minute rest period. . . . In general, [the] California Labor Code regulates private employment unless a provision explicitly states that it applies to public sector employment. Employees providing patient care in a public health setting and at the University of California may currently be entitled to a meal and rest period; however, these rights would have to be negotiated as part of their collective bargaining agreement. This bill statutorily entitles these workers to a meal and rest period . . . eliminating the need for these rights to be collectively bargained." (*Id*. at p. 4.)

c. *Agency Interpretations*

Administrative agency interpretations are also in accord. In considering how the wage orders applied to those staffed in temporary government positions, the Department of Labor Standards Enforcement (DLSE) opined that if "workers are employed directly by the public entity . . . the bulk of the wage order provisions would not apply." (Dept. Industrial Relations, DLSE Opn. Letter No. 2003.01.10 (Jan. 10, 2003) p. 3; see *id*. at p. 4 ["if the workers are employees of the public entity, then they are not subject to the wage orders and any work schedule which meets the requirements of the Fair Labor Standards Act [of 1938 (29 U.S.C. § 201 et seq.)] would suffice"].) While DLSE opinion letters are not entitled to deference, they are generally considered with respect. (*Kilby v. CVS Pharmacy, Inc.* (2016) 63

Cal.4th 1, 13 (*Kilby*); see *Brinker, supra,* 53 Cal.4th at p. 1029, fn. 11.)

>          d.      *Case Law*

Finally, appellate decisions have uniformly concluded that, unless the laws in question expressly state otherwise, the Labor Code's wage and hour requirements do not apply to public employers. Relying in part on the statutory interpretation maxim that "absent express words to the contrary, governmental agencies are not included within the general words of a statute" (*Wells, supra,* 39 Cal.4th at p. 1192), the court in *Johnson* concluded provisions requiring overtime pay (§ 510) and meal breaks (§ 512) do not apply to public agencies. (*Johnson, supra,* 174 Cal.App.4th at pp. 736–738.) *California Correctional, supra,* 188 Cal.App.4th at pages 652–654 agreed with this interpretation of section 512 and extended it to section 226.7, which requires rest and recovery periods. In so doing, it rejected an argument that an express exemption for the state regarding wage payments (§ 220, subd. (a)) implied that all other provisions in the chapter applied to public agencies by default. (*California Correctional,* at pp. 653–654; see *Kajberouni v. Bear Valley Community Services Dist.* (E.D. Cal. 2022) 599 F.Supp.3d 961, 966–968 [relying on *Johnson* and *California Correctional* to dismiss meal and rest break claims against a public entity].) *Morales v. 22nd Dist. Agricultural Assn.* (2018) 25 Cal.App.5th 85, 94–95, followed *Johnson* in concluding public entities are not subject to overtime obligations under section 510 or IWC wage order No. 10-2001 (Cal. Code Regs., tit. 8, § 11100), even when they act as a joint employer. *Allen, supra,* 86 Cal.App.5th at pages 597–598 also followed *Johnson* in holding that meal and rest break and overtime laws (§§ 226.7, 510, 512) do not apply to public employers. Indeed,

the parties in *Allen* agreed that public entities are exempt from these requirements, and the only question was whether the defendant was a public entity. (*Allen*, at p. 598.)[8]

Cases reaching an opposite conclusion are distinguishable because they involved provisions that are expressly applicable to public employers. *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, for example, considered whether the minimum wage provision in IWC wage order No. 4-2001 (Cal. Code Regs., tit. 8, § 11040) applied to a public employer. Like Wage Order No. 5 here, the *Sheppard* wage order stated that its provisions did not apply to public employers " '[e]xcept as provided in Sections 1 [("Applicability of Order")], 2 [("Definitions")], 4 [("*Minimum Wages*")], 10 [("Meals and Lodging")], and 20 [("Penalties")].' " (*Sheppard*, at p. 300, italics added.) Because this language expressly carves out an exception, *Sheppard* concluded the wage order's minimum wage requirements apply to all employers, including public entities. (*Id.* at pp. 300–301.) Similarly, *Flowers v. Los Angeles County Metropolitan Transportation Authority* (2015) 243 Cal.App.4th 66 considered a public transit authority's liability for minimum wage and rest break violations. But these claims arose under IWC wage order No. 9-2001 (Cal. Code Regs., tit. 8, § 11080), which was amended in

---

[8] In a related context, *Krug v. Board of Trustees of California State University* (2023) 94 Cal.App.5th 1158, review granted December 13, 2023, S282131 (*Krug*) recently concluded California State University, a public institution, was not required to reimburse employees for work-related expenses under section 2802. The court's analysis relied heavily on the sovereign powers doctrine, however, and did not consider the Labor Code's definition of "person" in section 18. (See *Krug*, at pp. 1166–1170.)

2004 to make minimum wage and rest period requirements expressly applicable to public transit drivers. (*Flowers*, at pp. 76–77.) Finally, *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912 discussed public entity liability when construing IWC wage order No. 15-2001 (Cal. Code Regs., tit. 8, § 11150). The wage order at issue in *Guerrero* was exceptional because "*unlike* 14 of the 17 industry, occupation and miscellaneous wage orders (including wage order No. 4–2001 at issue in *Sheppard* . . .), wage order No. 15–2001 *does not expressly exempt* public employees from its provisions." (*Guerrero*, at p. 954.) Accordingly, based on its plain language, the wage order's requirements applied to public as well as private employers. (*Id*. at p. 955.) In contrast to *Guerrero*, the wage order at issue here *does* include an exemption for public employers. (Wage Order No. 5, subd. 1(C).) And, in contrast to *Sheppard* and *Flowers*, the exemption does not carve out an exception for meal periods (*id*., subd. 11) or rest periods (*id*., subd. 12).

### 2. *AHS Is an Exempt Public Employer*

Plaintiffs largely concede that the Labor Code provisions at issue are generally not applicable to public employers. Their primary argument is that the provisions apply to AHS because AHS is not a public entity. Specifically, they urge that the exemption from wage and hour requirements extends only to a *subset* of public entities: those with sovereign governmental powers that would be infringed by application of these laws. Plaintiffs' argument misapprehends the sovereign powers doctrine.

Our analysis begins with the text of the enabling statute.[9] It was also the foundation of the Court of Appeal's analysis. This special legislative enactment empowered the Alameda County Board of Supervisors to create AHS to discharge the county's mandatory duty to provide medical care to qualifying residents. Because section 101850 enabled the creation of AHS, and specifically delineated AHS's powers and obligations in regard to several laws, its text offers the best evidence of legislative intent as to the entity's public status. (See *People v. Trevino* (2001) 26 Cal.4th 237, 241.) The statutory text consistently demonstrates that the Legislature considered AHS to be a quasi-governmental public entity.

The enabling statute repeatedly describes AHS as a "public agency." In a subdivision devoted to definitions, it states that " 'Hospital Authority' means the separate *public agency* established" pursuant to the enabling legislation. (Health & Saf. Code, § 101850, subd. (a)(2)(C), italics added.) The statute authorizes AHS to "apply as a *public agency*" for appropriate health care licenses. (*Id.*, subd. (g), italics added.) It dictates that "[t]he hospital authority shall be a *public agency* subject to the Meyers-Milias-Brown Act" (*id.*, subd. (u), italics added), which governs labor-management relations in local government (Gov. Code, § 3500 et seq.). It also deems AHS "a *public agency*

---

[9]     Within the same division of the Health and Safety Code as AHS's enabling statute, the Legislature has authorized special health authorities for several other local governments. (See Health & Saf. Code, §§ 101525 [Sonoma County Dental Health Authority], 101550–101565 [Monterey County Special Health Care Authority], 101655–101657 [Central Coast Hospital Authority], 101675–101820 [Santa Barbara County Special Health Care Authority], 101852–101856 [Kern County Hospital Authority].)

for purposes of eligibility with respect to grants and other funding and loan guarantee programs." (Health & Saf. Code, § 101850, subd. (ag), italics added.) As defined by the Health and Safety Code, a " '[p]ublic entity' includes the state, a county, city, district, *public authority*, *public agency*, and any other political subdivision or public corporation in the state." (Health & Saf. Code, § 13050.1, italics added.) As a public hospital authority, and a public agency under the enabling statute's terms, AHS is clearly a "public entity" encompassed by this definition.

Moreover, several provisions of the enabling statute address AHS's rights and liabilities under laws that specifically apply to public entities. The statute dictates that members of AHS's governing board "shall not be vicariously liable for injuries caused by the act or omission of the hospital authority to the extent that protection applies to members of governing boards of local public entities" under the Government Claims Act (Gov. Code, § 810 et seq.). (Health & Saf. Code, § 101850, subd. (t); see Gov. Code, § 820.9.) Another subdivision extends the same immunity to AHS employees, providing that they "are public employees" for purposes of Government Claims Act provisions "relating to claims and actions against public entities and public employees." (Health & Saf. Code, § 101850, subd. (w)(3); see Gov. Code, § 811.4 [" 'Public employee' means an employee of a public entity"].) The law declares AHS "is not a 'person' subject to suit under the Cartwright Act." (Health & Saf. Code, § 101850, subd. (ab); see Bus. & Prof. Code, § 16702 [defining "person"]; see also *Blank v. Kirwan* (1985) 39 Cal.3d 311, 323 [holding "actions of political subdivisions of the state . . . are outside the scope of the act"].) The statute also specifies that open sessions conducted by AHS "constitute official

proceedings authorized by law" and are privileged under Civil Code section 47. (Health & Saf. Code, § 101850, subd. (af).) Finally, it requires AHS to comply with Government Code requirements for employment contracts between employees and local agency employers. (*Id.*, subd. (an); see Gov. Code, § 53260.)

Other parts of the enabling statute specifically *exempt* AHS from laws that generally apply to public entities. These provisions are instructive because they indicate the Legislature viewed AHS as a public entity that would have otherwise been subject to the laws in question. Thus, the statute dictates that AHS records "shall not be subject to disclosure pursuant to the California Public Records Act." (Health & Saf. Code, § 101850, subd. (ad)(3); see Gov. Code, § 7920.000 et seq.) The statute further provides that meetings of the AHS governing board convened for the sole purpose of discussing or acting on trade secrets may be held in closed session, with the "public report of actions taken in closed session . . . limited to a brief general description." (Health & Saf. Code, § 101850, subd. (ae)(1).) This subdivision appears to define a limited exception to the requirements of the Ralph M. Brown Act, which requires that all meetings of legislative bodies and local agencies "be open and public." (Gov. Code, § 54953.) Finally, the enabling statute declares that "[n]otwithstanding [provisions] of the Government Code related to incompatible activities," AHS administrative staff "shall not be considered to be engaged in" such incompatible activities "as a result of employment or affiliation with the county." (Health & Saf. Code, § 101850, subd. (ac); see Gov. Code, § 1125 et seq.) Again, these exceptions would not have been necessary unless AHS was a governmental entity to which the referenced laws otherwise applied.

Substantively, the enabling statute describes several ways in which AHS's affairs are intertwined with, and dependent upon, Alameda County. All members of AHS's governing board are appointed, "both initially and continually," by the county's Board of Supervisors. (Health & Saf. Code, § 101850, subd. (c).) The Board of Supervisors also has responsibility for adopting and amending the medical center's bylaws (*id.*, subd. (e)) and retains sole control over use of the medical center's "physical plant and facilities" (*id.*, subd. (*o*)). With some exceptions, AHS employees "are eligible to participate in the [Alameda] County Employees Retirement System." (*Id.*, subd. (s); see Health & Saf. Code, § 101851 [defining the exceptions].) The statute authorizes AHS to borrow money from the county to operate the medical center (Health & Saf. Code, § 101850, subd. (y)) and requires AHS to provide the county with quarterly reports on both patient care "and any other data required by the county" (*id.*, subd. (am)(3)). The county's Board of Supervisors has full authority to "terminate the activities of [AHS] and expire [AHS] as an entity" if it determines AHS should no longer perform its intended functions. (*Id.*, subd. (ak).)[10]

---

[10]   At AHS's request, we took judicial notice of evidence offered to show AHS operates in a close relationship with the county. For example, the county's annual comprehensive financial report for the year ending June 30, 2021, includes detailed information on AHS's revenues and costs as part of the county's financial statements. The report explains that the county has retained ownership of certain hospital facilities and leases them to AHS for $1 annually. It also indicates the county has helped finance AHS's operations. This assistance includes allocating to AHS 75 percent of the revenue generated from a voter-approved sales tax increase.

Despite the weight of these repeated indications that AHS is a public entity, the Court of Appeal relied on a single subdivision of the enabling statute to reach a contrary conclusion. Subdivision (j) of that statute states: "A hospital authority created pursuant to this chapter shall be a legal entity separate and apart from the county and shall file the statement required by Section 53051 of the Government Code. The hospital authority shall be a government entity separate and apart from the county, *and shall not be considered to be an agency, division, or department of the county*. The hospital authority shall not be governed by, nor be subject to, the charter of the county and shall not be subject to policies or operational rules of the county, including, but not limited to, those relating to personnel and procurement." (Health & Saf. Code, § 101850, subd. (j), italics added.) Relying on the italicized language, the Court of Appeal contrasted AHS with defendants in *Johnson*, *supra*, 174 Cal.App.4th 729 and *California Correctional*, *supra*, 188 Cal.App.4th 646, both of which were designated as state agencies. (See *Stone*, *supra*, 88 Cal.App.5th at p. 93.) The court remarked, "Here, far from identifying respondent with the state (or one of its political subdivisions), respondent's enabling statute actively *discourages* such an identification." (*Id.* at pp. 93–94.) For that reason alone, it found the enabling statute offered no positive indicia of a legislative intent to exempt AHS from the Labor Code's meal and rest break requirements. (*Id.* at p. 94; see *Wells*, *supra*, 39 Cal.4th at p. 1193.)

The Court of Appeal viewed the enabling statute through far too narrow a lens. Even the sentence the court relied on explicitly states that AHS "shall be a government entity." (Health & Saf. Code, § 101850, subd. (j).) The subdivision does not go on to negate this statement, as the court suggested. It

24

provides that AHS *is* a government entity, but one that is separate from the county. The Court of Appeal itself recognized that AHS "is a 'governmental entity' of some kind." (*Stone, supra,* 88 Cal.App.5th at p. 97.) California has a great many governmental agencies. The fact that they are not all fully autonomous sovereigns does not nullify their governmental status. The court cited no authority for its assumption that the Labor Code's exemption for public employers extends only to public entities that are acknowledged divisions of a state or local government body. Nor do plaintiffs. Absent such authority, we are guided by the statute's repeated references to AHS's public entity status.

This reading is confirmed by Health and Safety Code section 101850, subdivision (j)'s own requirement that AHS file statements pursuant to Government Code section 53051. Under that statute, every " 'public agency,' " defined as "a district, public authority, public agency, and any other political subdivision or public corporation" (Gov. Code, § 53050), must file a statement with the Secretary of State for inclusion in the state's registry of public agencies (Gov. Code, § 53051). Such filings ensure that AHS enjoys public agency immunity under the Government Claims Act. (See *Wilson v. San Francisco Redevelopment Agency* (1977) 19 Cal.3d 555, 557–558.) Requiring public agency filings is a strong indication that the Legislature intended for AHS to be treated as a governmental entity. Moreover, even though the enabling statute states that AHS is not to be considered *part* of the county, it gives AHS some of the same powers and protections as a division of government. AHS is subject to state and federal tax laws in the same manner as a county (Health & Saf. Code, § 101850, subd. (z)), its nonproprietary income is "exempt from state income taxation"

(*id.*, subd. (ag)), and donations to it are "tax deductible to the extent permitted by state and federal law" (*ibid.*). The enabling statute also explicitly states that, upon transfer of the medical center's control or ownership to AHS, AHS shall have "*all the rights and duties set forth in state law with respect to hospitals owned or operated by a county.*" (*Id.*, subd. (m), italics added.)[11]

Based on all the foregoing, we cannot agree with the Court of Appeal that by designating AHS a "government entity separate and apart from the county" the Legislature intended it to be treated as a private employer. On the contrary, read as a whole, the enabling statute makes clear that AHS is a public entity.[12] Accordingly, as a public employer, AHS is not a "person" subject to liability for the meal and rest break and associated payroll records violations alleged in plaintiffs' complaint. (See § 18; Wage Order No. 5, subd. 2(H).)

The language of Wage Order No. 5, which defines the scope of the Labor Code's protections in the relevant industry, supports this conclusion. With exceptions not relevant here, it

---

[11] An amicus curiae brief filed by local government associations in support of AHS asserts that designating special districts as separate governmental entities "is essential to risk management." Such designations help to ensure that a special district's liabilities are not imposed upon the city or county they serve.

[12] Legislative history of the enabling statute is in accord. The transfer of management to AHS was intended to give Alameda County greater flexibility and help it reduce the costs of running its public health facilities (see Health & Saf. Code, § 101850, subd. (a)(1); Sen. Local Gov. Com., Analysis of Assem. Bill No. 2374 (1995–1996 Reg. Sess.) as amended Jun. 24, 1996, at p. 1), but there is no indication the Legislature meant to privatize the county's delivery of health care.

states that "the provisions of this order shall not apply to any employees directly employed by the State *or any political subdivision thereof*, including any city, county, *or special district*." (Wage Order No. 5, subd. 1(C), italics added.)

Plaintiffs argue AHS cannot be considered a political subdivision of the state because it lacks "geographical jurisdiction." They glean this asserted requirement from two statutes not at issue here: the False Claims Act, which states that the term " 'political subdivision' " includes any "legally authorized local governmental entity with jurisdictional boundaries" (Gov. Code, § 12650, subd. (b)(6)), and the California Voter Participation Rights Act, which defines the term as "a geographic area of representation created for the provision of government services" (Elec. Code, § 14051, subd. (a)). But all statutory definitions of the term are broad, and most make no reference to the need for a "geographic jurisdiction." For example, the Labor Code itself states: " 'Political subdivision' includes any county, city, *district*, public housing authority, *or public agency* of the state, and assessment or improvement districts." (§ 1721, italics added.) Similarly broad definitions of "political subdivision" can be found in several other codes. (See, e.g., Gov. Code, §§ 8557, subd. (b) ["includes any city, city and county, county, district, or other local governmental agency or public agency authorized by law"], 8698, subd. (a) ["includes the state, any city, city and county, county, special district, or school district or public agency authorized by law"]; Pub. Util. Code, §§ 1402 ["means a county, city and county, city, municipal water district, county water district, irrigation district, public utility district, or any other public corporation"], 21010 ["means any county, city, city and county, public corporation, district or other political entity or

27

public corporation of this State"]; Rev. & Tax Code, § 8732.1 ["means any governmental organization formed and operating under the authority of the laws of this state and includes counties, cities, cities and counties, school districts, fire protection districts, irrigation districts, and recreation districts"].)

AHS was expressly authorized by the Legislature as a "public agency" (Health & Saf. Code, § 101850, subds. (a)(2)(C), (g), (u), (ag)) and falls easily within the meaning of "political subdivision" in the Labor Code and Wage Order No. 5. Indeed, a related chapter of the Health and Safety Code makes clear that the Legislature considers regional hospital authorities like AHS to be political subdivisions. The enabling statute for Kern County Hospital Authority, an amicus curiae here, states: "This chapter is necessary to allow the formation of a new *political subdivision*, a public hospital authority . . . ." (Health & Saf. Code, § 101852, subd. (b)(5), italics added.) Plaintiffs have suggested no reason why the Legislature would have extended the wage order exemption to Kern County's hospital authority but not to that of Alameda County. Finally, even assuming AHS does not fall within the category of a "political subdivision" or "special district" as those terms are used in the wage order, plaintiffs' argument ignores the exemption's use of the word "including." As noted above, "the word 'including' in a statute is 'ordinarily a term of enlargement rather than limitation.' " (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 717.) The wage order's use of this term indicates that the exemption applies to public entities beyond the examples listed.

The Court of Appeal reached a different conclusion about AHS. It found the enabling statute contained no "positive indicia" of legislative intent (*Wells*, *supra*, 39 Cal.4th at p. 1193)

to treat AHS as a public entity. (*Stone, supra*, 88 Cal.App.5th at p. 94.) It went on to consider "whether any ' "infringement upon sovereign [governmental] powers" ' would result from subjecting" AHS to the requirements of Wage Order No. 5 or the relevant statutes. (*Stone*, at p. 94.) It concluded there was no such infringement because AHS lacked sovereign powers in the first place. The court reasoned that providing medical care to the indigent is " '*not* a core government function' " and so could be delegated to private parties. (*Ibid*.) It faulted AHS for failing to distinguish "between powers wielded by itself, on one hand, and those that might be wielded by a private institution to whom the county has delegated its function of poverty alleviation, on the other." (*Id*. at p. 95.) Having equated AHS with a "private institution," the court concluded no sovereign powers would be implicated by subjecting AHS to liability for the alleged meal and rest break violations. (*Ibid*.)

The Court of Appeal's analysis stumbles at the threshold. Nowhere does the opinion explain how AHS can be understood to be a private institution when it was created by a county board of supervisors, pursuant to necessary authorization from the state Legislature, and upon terms requiring the county's ongoing involvement in AHS's board membership, bylaws, licensure, and finances.

In any event, we need not decide whether the Court of Appeal's sovereign powers analysis is correct. As noted, the sovereign powers principle is merely a maxim of statutory construction that "can help resolve an unclear legislative intent." (*Wells, supra*, 39 Cal.4th at p. 1193.) Because numerous sources reveal positive indicia of legislative intent both to treat AHS as a public entity and to exclude public entities from the Labor Code requirements at issue, we need not

employ this interpretive maxim. (See *Allen*, *supra*, 86 Cal.App.5th at pp. 600–601 [concluding convention center corporation was an exempt public entity without conducting sovereign powers analysis].)

Nor are plaintiffs correct to suggest a sovereign powers analysis takes precedence over contrary indications of legislative intent. According to plaintiffs, "Under the sovereign powers maxim only those entities whose sovereign powers . . . would be infringed by application of the statute are exempt from those statutes." This analysis puts the cart before the horse. "Maxims of statutory construction . . . are not immutable rules but instead are guidelines subject to exceptions." (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 213 (*Wishnev*).) While interpretive maxims are helpful aids to statutory construction, they are to be consulted only when statutory language is unclear. (See *Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) "In construing a statute a court's objective is to ascertain and effectuate the underlying legislative intent. [Citation.] This fundamental rule overrides the [sovereign powers] doctrine, just as it would any maxim of jurisprudence, if application of the doctrine or maxim would frustrate the intent underlying the statute." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012.) In other words, the sovereign powers maxim "cannot override positive indicia of a contrary legislative intent." (*Wells*, *supra*, 39 Cal.4th at p. 1193.)

In the same vein, plaintiffs contend an employer can be considered a public entity exempt from Labor Code requirements *only* if it has the same sovereign powers as a city or county. Yet the only authority they cite for this proposition, *Gateway*, *supra*, 9 Cal.App.5th 499, addressed a different

question. The issue there was whether a "nonprofit public benefit corporation" that operated charter schools could be considered a " 'municipal corporation' " under a specific exemption set forth in in section 220, subdivision (b). (*Gateway*, at pp. 502–503; see *post*, at pp. 39–42.) Assuming *Gateway* correctly decided this question, its holding cannot support plaintiffs' broad assertion that only entities with the same sovereign powers as a division of government, such as taxing or eminent domain authority, are exempt from Labor Code requirements. Many aspects of AHS's creation and ongoing close relationship with county government distinguish it from the nonprofit corporation in *Gateway*. To the extent "hallmarks of sovereignty" (*Stone*, *supra*, 88 Cal.App.5th at p. 89) are required to make AHS an exempt public entity, those identified above suffice. (Cf. *Hagman v. Meher Mount Corp.* (2013) 215 Cal.App.4th 82, 88 [observing public benefit corporations lacked these "element[s] of sovereignty" and are not public entities immune from adverse possession].)

It is evident from the statutes and Wage Order No. 5, as well as relevant legislative history and administrative interpretations, that the Legislature intended to exempt public entities from meal and rest break obligations. It is also clear from the text of Health and Safety Code section 101850 that the Legislature intentionally authorized AHS to be created as a public entity. The statutes provide no basis for us to impose an additional "sovereign powers" requirement in examining AHS's public entity status. Moreover, plaintiffs' proposed analysis would lead to uncertain and inconsistent results. In every case, a public entity's exemption would turn upon a court's assessment of whether sovereign powers would be infringed. Besides the absence of a statutory basis, such an outcome would

frustrate the Legislature's clear intent to exclude public entities from the Labor Code requirements at issue. Accordingly, the trial court properly sustained the demurrer to plaintiffs' first and second causes of action for meal and rest break violations and their third cause of action under section 1174 for associated payroll violations.

C.     *Public Entity Liability for Related Wage Violations*

Plaintiffs' fifth and sixth causes of action regarding nonpayment of wages are premised on AHS's alleged failure to compensate them for meal and rest breaks and associated overtime to which they were entitled.[13]  Because we have determined that AHS, as a public entity employer, had no obligation under the Labor Code to provide meal and rest breaks, all claims premised on the asserted violations necessarily fail.  Nevertheless, the parties have asked us to address the scope of public entity liability under the statutes in question, and there is a split of authority related to the issue. Having examined the relevant statutory text, history, and administrative interpretations, we now conclude public hospital authorities such as AHS are excluded from liability under several of the asserted provisions.

Plaintiffs have alleged violations of statutes that, for purposes of this opinion, we will call the Labor Code's "wage

---

[13]     The fifth cause of action alleges plaintiffs "were paid ½ hour per day less than their actual working hours on those days when Defendants' [*sic*] unlawfully denied them meal periods but deducted ½ hour nonetheless."  The sixth cause of action alleges defendants failed to timely pay "wages which were earned but not paid when Defendants improperly deducted ½ hour from [plaintiffs'] wages for meal periods not taken, and . . . premium wages for missed meal and rest breaks."

payment" provisions.[14] These statutes establish requirements for the amount and timing of wage payments (see, e.g., §§ 204, 222, 223, 1194) and prescribe penalties for the failure to pay full wages in a timely fashion (see, e.g., §§ 210, 225.5). Although some of the wage payment laws have now been extended to state employees (see *McLean, supra,* 1 Cal.5th at p. 619), the Labor Code specifically exempts local government employers from the requirements of some wage payment laws. Section 220, subdivision (b) defines this exemption. It states: "Sections 200 to 211, inclusive, and Sections 215 to 219, inclusive, do not apply to the payment of wages of employees directly employed by any county, incorporated city, or town *or other municipal corporation.* All other employments are subject to these provisions." (§ 220, subd. (b), italics added.)[15] AHS's potential

---

[14]     This nomenclature is meant to refer only to the subset of laws asserted in plaintiffs' complaint. Specifically, plaintiffs cite sections 201, 204, 218.5, 218.6, 222, 223, 222.5, 510, 1194, 1194.2, and 1198. The parties refer to these laws as "prompt payment" provisions. (See *McLean, supra,* 1 Cal.5th at p. 619.) *McLean* used this phrase to refer to sections 201 through 203, which govern the payment of final wages to an employee who resigns or is discharged. (See *McLean,* at pp. 618–619.) Plaintiffs here are not seeking to recover final wages, and their complaint alleges violations of different statutes. For this reason, we do not adopt the parties' phrasing.

[15]     Amicus curiae California Employment Lawyers Association (CELA) argues specific exemptions for public employers, like this one, are evidence the Legislature intended all generally applicable provisions of the Labor Code to encompass public as well as private employment. The argument disregards the specific context and history of the provisions at issue. For example, the prompt payment statutes were first enacted in 1911, before the Labor Code existed. (Stats. 1911,

liability under the statutes referenced in section 220, subdivision (b) thus turns on whether it constitutes a "municipal corporation" for purposes of the exemption.[16]

The Labor Code does not define "municipal corporation," but the term's meaning is informed by historical precedent. *In re Madera Irrigation District* (1891) 92 Cal. 296 (*Madera*) discussed the Legislature's constitutional authority to create municipal corporations. We quoted a treatise's definition: " 'A municipal corporation proper is created mainly for the interest, advantage, and convenience of the locality and of its people. The primary idea is an agency to regulate and administer the interior concerns of the locality in matters peculiar to the place incorporated, and not common to the state or people at large.' " (*Id.* at p. 323.) The Legislature has the power to create such corporations to serve a specific public purpose, and it need only grant them the limited powers necessary to serve that purpose.

---

ch. 663, § 1, p. 1268; see *McLean, supra,* 1 Cal.5th at p. 619, fn. 1.) The Legislature's 1937 adoption of these provisions into the new Labor Code, including the exemption for public employers, does not signal a general intent to *include* public employers throughout unrelated provisions of the code, contrary to statutory text and legislative history.

[16] It is important to note that plaintiffs' fifth and sixth causes of action allege violations of some statutes (§§ 222, 223, 225.5; see also §§ 510, 1194, 1194.2, 1198) that do *not* fall within the section 220, subdivision (b) exemption. Consistent with the parties' briefing and the decision below, our opinion here addresses only whether AHS is a "municipal corporation" for purposes of section 220, subdivision (b). We express no view on whether or to what extent public entities may be liable for Labor Code violations beyond the scope of the section 220, subdivision (b) exemption, or whether plaintiffs can allege a sufficient factual basis for claims that are not affected by the exemption.

(*Id.* at p. 318.) *Madera* made clear that "[t]he municipal corporations which may be thus created are not limited to cities and towns." (*Id.* at p. 319.) Rather, they may be formed as "mere agencies of the state in local government, without any powers except such as the legislature may confer upon them, and . . . at all times subject to a revocation of such power." (*Id.* at pp. 319–320.) Subsequently, *Morrison v. Smith Bros.* (1930) 211 Cal. 36, 39 distinguished between "two different species" of public corporations for tort law purposes. While incorporated cities or towns constitute "municipal corporation[s] proper" (*id.* at p. 40), quasi-municipal corporations encompass organizations created to assist state or local governments in providing a public service (*id.* at pp. 40–41). Generally, the term "municipal corporation" has been understood to include both categories. (See *id.* at p. 41.)

Section 220, subdivision (b) defines an exemption for "any county, incorporated city, or town or other municipal corporation." Because the statute specifically names "county, incorporated city, [and] town" (*ibid.*), it is evident that "municipal corporation" refers to something *other than* one of these defined local entities. (See *Madera, supra,* 92 Cal. at p. 319.) " 'The only reasonable interpretation of this section is that the Legislature knew from the decided cases that "incorporated city or town" referred to a municipal corporation in the strict sense, and intended that the additional term "or other municipal corporation" should refer to municipal corporations in the commonly accepted sense — namely, public corporations or quasi-municipal corporations. Any other interpretation would give no meaning to the term "or other municipal corporation." ' " (*Division of Labor Law Enforcement v. El Camino Hosp. Dist.* (1970) 8 Cal.App.3d Supp. 30, 35 (*El*

*Camino*).) The statute directly following section 220 also supports a broad reading of "municipal corporation." Section 220.2 states, in relevant part: "Contributions to vacation allowances, pension or retirement funds, sick leave, and health and welfare benefits on behalf of persons employed by any county, political subdivision, incorporated city or town *or other municipal corporations* may be made in the same manner and on the same basis as made by private employers." (Italics added.) Again, the Legislature has used "municipal corporation" to refer to something *other than* a "county, political subdivision, incorporated city or town." (*Ibid.*)

The history of section 220's enactment reinforces this construction. The requirement that wages be timely paid in full traces back to a 1911 law, which imposed these payment obligations on "[a]ny person, firm or corporation" employing labor. (Stats. 1911, ch. 663, § 3, p. 1269.) Similar to section 220, subdivision (b), the original wage payment law declared: "None of the provisions of this act shall apply to any county, city and county, incorporated city or town, or other municipal corporation." (Stats. 1911, ch. 663, § 4, p. 1269.) The 1911 law was later amended, then repealed. When it was reenacted in 1919, the Legislature included the express exemption for public employers (Stats. 1919, ch. 202, § 10, p. 297) and specifically described the law as "[a]n act to regulate the payment of wages or compensation for labor or service *in private employments* . . . ." (Stats. 1919, ch. 202, p. 294, italics added.) In 1937, the law's provisions were codified in sections 200 to 225 of the newly created Labor Code. (See *McLean, supra,* 1 Cal.5th at p. 619, fn. 1; *Smith v. Superior Court* (2006) 39 Cal.4th 77, 87, fn. 4; see also Stats. 1937, ch. 90, §§ 200–225, pp. 197–200.) When the wage payment requirements were codified, so too was the

exception for government employers.  The original version of section 220 stated that the wage payment laws codified in sections 200 to 211 and 215 to 219 did not "apply to the payment of wages of employees directly employed by the State or any county, incorporated city or town or other municipal corporation."  (Stats. 1937, ch. 90, § 220, p. 200.)  Other than carving out state employment for separate treatment in section 220, subdivision (a), the Legislature has not altered the exemption in any significant way or sought to limit its reach to a narrower subset of government employers.

Administrative interpretations also support a broad reading of the term "municipal corporation" in section 220, subdivision (b).  As noted, before the IWC wage orders were amended in 2001, they exempted government employers from all requirements.  (See *ante*, at pp. 14–15; *California Correctional*, *supra*, 188 Cal.App.4th at p. 655.)  The wording of this exemption was nearly identical to the language of section 220, subdivision (b).  It stated:  "The provisions of this Order shall not apply to employees directly employed by the State or any county, incorporated city or town or other municipal corporation."  (Cal. Code Regs., tit. 8, former § 11380 [former wage order No. 5-76, subd. 1(C)]; compare § 220, subd. (b) ["Sections 200 to 211, inclusive, and Sections 215 to 219, inclusive, do not apply to the payment of wages of employees directly employed by any county, incorporated city, or town or other municipal corporation"].)  The exemption in pre-2001 wage orders has been interpreted broadly to include *all* public employers.  (See, e.g., *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 540–541; *California Correctional*, at p. 655.)

Perhaps most telling, the Labor Commissioner's office itself has concluded that government entities, *and AHS in particular*, are not subject to wage payment statutes within the section 220, subdivision (b) exemption. The DLSE, "headed by the Labor Commissioner, is authorized to enforce California's labor laws." (*Kilby*, *supra*, 63 Cal.4th at p. 13.) Although the DLSE's enforcement policies are not entitled to special judicial deference because they were not adopted in compliance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.; see *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568–577), interpretations the agency has reached in the course of case-specific adjudication may offer persuasive guidance in similar cases (*Kilby*, at p. 13). Courts therefore "generally consider DLSE opinion letters with respect" (*ibid*.), "having due regard for the agency's expertise and special competence, as well as any reasons the agency may have proffered in support of its interpretation." (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 559 (*Alvarado*); see *Harris v. Superior Court* (2011) 53 Cal.4th 170, 190.)

At AHS's request, we have taken judicial notice of nearly a dozen letters and notices from the Labor Commissioner declining to proceed against AHS based on section 220, subdivision (b). Citing this statute, several letters state that DLSE "does not have jurisdiction over regular wages and waiting time penalties claims against government entities, such as the Alameda Health System." Similarly, one notice explains that the office is closing its investigation of AHS because: "Pursuant to Labor Code Section 220(b), penalties under Labor Code Section 203.1 do not apply to public entities such as named Defendant, Alameda Health System." Although the opinions

stated in these letters are not controlling authority, and some address wage violations different from those alleged here, the opinions reflect the considered views of an agency with deep experience and special expertise in enforcing the Labor Code provisions at issue. (See *Alvarado, supra*, 4 Cal.5th at p. 559; *Brinker, supra*, 53 Cal.4th at p. 1029, fn. 11.) As such, they offer persuasive support for AHS's interpretation of section 220, subdivision (b).

A broad interpretation of "municipal corporation" is also consistent with the view prevailing in decades of case law. In *El Camino, supra*, 8 Cal.App.3d. Supp. 30, a case dating from 1970, a predecessor agency to the DLSE sued a hospital district for unpaid wages and penalties. The trial court sustained a demurrer, concluding the hospital district was a "municipal corporation" for purposes of the section 220, subdivision (b) exemption. (*El Camino*, at pp. Supp. 32–33.) Its ruling, adopted by the superior court's appellate department, reasoned that the statute's use of "municipal corporation" signifies a broad reference to "public corporations or quasi-municipal corporations" (*id.* at p. Supp. 35), and a hospital district falls within this category because it is a public agency " 'created or authorized by the Legislature to aid the state in some form of public or state work, other than community government' " (*id.* at p. Supp. 33). *Johnson, supra*, 174 Cal.App.4th 729 relied on *El Camino* in holding that a water storage district was an exempt municipal corporation under section 220, subdivision (b). The court reasoned that such districts "perform an essential government function for a public purpose . . . through an elected board of directors with regulatory powers." (*Johnson*, at p. 741.) Similarly, *Kistler v. Redwoods Community College Dist.* (1993) 15 Cal.App.4th 1326, 1337 held that a

community college district was a "municipal corporation" exempt from fee-shifting provisions of the wage payment statutes. (See §§ 218.5, 220, subd. (b).)[17]

Plaintiffs counter that all of these cases involved entities that, unlike AHS, held sovereign governing powers. Their argument rests heavily on *Gateway*, *supra*, 9 Cal.App.5th 499, the sole decision we have encountered that imposes a narrow reading on the term "municipal corporation" in section 220, subdivision (b). *Gateway*'s analysis on this point is questionable, however, and its holding is distinguishable.

The issue in *Gateway* was whether a nonprofit public benefit corporation operating charter schools is an exempt municipal corporation under section 220, subdivision (b). The court began its analysis by declaring the phrase "other municipal corporation" in section 220, subdivision (b) ambiguous. (*Gateway*, *supra*, 9 Cal.App.5th at p. 504.) Without considering the meaning ascribed to the term in prior case law, such as *Madera*, *supra*, 92 Cal. 296, or other sources, the court invoked the statutory construction maxims "*noscitur a sociis* ('literally, "it is known from its associates" ') and *ejusdem generis* ('literally, "of the same kind" ')" to resolve this perceived ambiguity. (*Gateway*, at p. 504.) The court observed that the words immediately preceding " 'other municipal corporation' " are " 'any county, incorporated city, or town.' " (*Ibid.*, quoting § 220, subd. (b).) Rather than concluding from this list that a

---

[17] In a related context, *Torres v. Board of Commissioners* (1979) 89 Cal.App.3d 545, 549–550, held that a housing authority was a "municipal corporation" for purposes of the Ralph M. Brown Act, setting the requirements for open meetings of local agencies.

"municipal corporation" must refer to some entity *other than* a county, incorporated city, or town, to avoid rendering the phrase surplusage (see *Madera,* at p. 319; *El Camino, supra,* 8 Cal.App.3d at p. Supp. 35), the court asked "what key characteristics are common to a 'county, incorporated city, or town' that another entity must possess to enable it to be characterized as an 'other municipal corporation.'" (*Gateway,* at p. 504.) While conceding that the performance of an important public function is a key requirement, *Gateway* asserted, without citation to authority, that courts "must also consider, for example, whether the entity is governed by an elected board of directors; whether the entity has regulatory or police powers; whether it has the power to impose taxes, assessments, or tolls; whether it is subject to open meeting laws and public disclosure of records; and whether it may take property through eminent domain." (*Id.* at p. 506.)

Applying these criteria, which it had derived solely from the *noscitur a sociis* and *ejusdem generis* maxims, the court concluded the nonprofit corporation before it was not an exempt municipal corporation. Although the company's provision of public education through charter schools served an essential governmental function, and its charter subjected it to both the Ralph M. Brown Act and California Public Records Act, the *Gateway* court found the corporation too different from a "county, incorporated city, or town" (§ 220, subd. (b)) to fall within the exemption. (*Gateway, supra,* 9 Cal.App.5th at pp. 506–507.) It explained: "Gateway does not have the power to acquire property through eminent domain; it may not impose taxes and fees upon those who live within its geographical jurisdiction, indeed it has no geographical jurisdiction but exists pursuant to its charter; it has no independent regulatory or

police powers but remains subject to the limitations of its charter throughout its existence; and its board of directors is not comprised of members elected by the public. Without these multiple crucial characteristics that are common to municipal and quasi-municipal corporations, we cannot conclude Gateway, a nonprofit public benefit corporation, is an 'other municipal corporation' for purposes of section 220(b). In truth, without the publicly elected board, the geographical jurisdictional boundary, and the power to forcefully raise funds or acquire property from people within its geographical jurisdiction, Gateway bears little resemblance to a 'county, incorporated city, or town' or to the quasi-municipal districts that have been deemed to qualify as 'other municipal corporations' (for purposes of section 220(b)), i.e., public school districts, hospital districts, and water storage districts." (*Gateway*, at pp. 506–507.)

*Gateway* is distinguishable from the present case in key respects. Although the *Gateway* employer served a public purpose by providing public education through charter schools, there was no suggestion it was itself a public entity. In *Wells*, we concluded nonprofit corporations operating charter schools were *not* entitled to the " 'public entity' immunity enjoyed by their chartering districts." (*Wells*, *supra*, 39 Cal.4th at p. 1200.) These corporations are often largely free from the interference and oversight of government bureaucracy, in both their operations and their finances. (*Id*. at p. 1201.) The same is not true of AHS. As discussed, AHS was created pursuant to specific legislative authorization, not a charter, and its affairs are closely overseen by the Alameda County Board of Supervisors. Moreover, in contrast to the Labor Commissioner's consistent rulings in multiple cases that AHS is exempt from certain wage payment statutes, the Commissioner "expressly concluded

Gateway did *not* qualify as an ' "other municipal corporation" ' under section 220(b)." (*Gateway*, *supra*, 9 Cal.App.5th at p. 503, italics added.)

Nor are we persuaded by *Gateway*'s narrow construction of "municipal corporation" in section 220, subdivision (b). The court cited no authority for its assertion that an exempt municipal corporation must possess sovereign powers equivalent to those of a local government. It imposed these requirements by applying maxims of construction and examining the types of entities found to constitute municipal corporations in previous decisions. (See *Gateway*, *supra*, 9 Cal.App.5th at pp. 505–506 [discussing the hospital, community college, and water storage districts at issue in *El Camino*, *Kistler*, and *Johnson*].) But these previous decisions simply considered whether the entities before them could be considered municipal or quasi-municipal corporations. None held that the term required the various hallmarks of sovereignty the *Gateway* court imposed. Moreover, *Gateway*'s analysis places undue emphasis on maxims of construction at the expense of other indicia of legislative intent. "Maxims of statutory construction, including the doctrine of *ejusdem generis*, are not immutable rules but instead are guidelines subject to exceptions . . . . '[*E*]*jusdem generis* is only an aid in getting the meaning and does not warrant confining the operations of a statute within narrower limits than were intended.' " (*Wishnev*, *supra*, 8 Cal.5th at pp. 213–214.)

Based on the language and history of section 220, subdivision (b), administrative interpretations of the provision, and relevant case law, we conclude AHS is a "municipal corporation" exempt from requirements of certain wage

payment statutes.  The trial court properly sustained AHS's demurrer to the fifth and sixth causes of action for this reason.

D.   *Public Entity Liability for PAGA Penalties*

Plaintiffs' seventh cause of action seeks penalties under PAGA (§ 2698 et seq.) for the various Labor Code violations alleged.[18]

Several Labor Code statutes require that, in addition to damages, employers who violate them pay civil penalties.  (See *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 80 (*Kim*).)  For example, an employer who unlawfully fails to pay full wages due must pay civil penalties of $100 for an initial violation as to each employee, $200 for each subsequent violation, and 25 percent of the amount unlawfully withheld.  (§ 225.5.)  Initially, only the Labor Commissioner could sue to recover civil penalties, but state enforcement proved problematic for a number of reasons.  (See *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 186–187 (*ZB*); *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 378–379.)  To enable broader enforcement and facilitate "maximum compliance" with the state's labor laws, the Legislature enacted PAGA.  (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980; see *Kim*, at p. 81.)  PAGA authorizes an "aggrieved employee" to

---

[18]   After oral argument in this case, the Legislature enacted extensive amendments to the PAGA statutes.  (Stats. 2024, ch. 44, § 1 [enacting Assembly Bill No. 2288, effective Jul. 1, 2024]; *id.*, ch. 45, § 1 [enacting Senate Bill No. 92, effective Jul. 1, 2024].)  The amendments are not at issue and no party suggests they should apply here.  Our discussion addresses versions of the PAGA statutes in effect throughout the litigation of this case, and we express no opinion on operation of the newly amended provisions.

pursue civil penalties on the state's behalf, with 75 percent of the recovery paid to the Labor and Workforce Development Agency (LWDA) and 25 percent to "aggrieved employees." (§ 2699, former subds. (a), (i); Stats. 2016, ch. 31, § 189, eff. Jun. 27, 2016.)  An " 'aggrieved employee' " is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  (§ 2699, former subd. (c).)[19]

We granted review, in part, to decide whether public employers are subject to PAGA penalties.  As with the wage payment claims discussed above, however, the predicate for plaintiffs' PAGA claim fails here since AHS is not liable for the underlying meal and rest break violations.  Because AHS, as a public employer, cannot be held liable based on the statutes giving rise to penalties, plaintiffs are not "aggrieved employees" for purposes of PAGA.  (See *Krug, supra,* 94 Cal.App.5th at pp. 1170–1171, review granted [dismissing derivative PAGA claims for lack of underlying violation]; *Gomez v. Regents of University of California* (2021) 63 Cal.App.5th 386, 404–405 [same].)  Although a plaintiff need not assert an unredressed injury to have standing under the version of PAGA in effect during this litigation, the statute plainly requires that the plaintiff have "sustain[ed] a Labor Code violation committed by

---

[19]  Recent amendments have changed the definition of "aggrieved employee" and the distribution of penalties recovered.  The law now defines " 'aggrieved employee' " for some purposes as a person employed by the alleged violator who "personally suffered each of the violations alleged" during a specified timeframe.  (§ 2699, subd. (c)(1).)  Further, under the new law, 65 percent of a PAGA recovery is paid to the LWDA and 35 percent to aggrieved employees.  (*Id.,* subd. (m).)

his or her employer." (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1121 (*Adolph*); see § 2699, former subd. (c); see also *Kim*, *supra*, 9 Cal.5th at pp. 83–85.) When liability for this underlying violation has not been established, any PAGA claims seeking penalties for the alleged violation must also fail. (See *Adolph*, at pp. 1123–1124; *Rocha v. U-Haul Co. of California* (2023) 88 Cal.App.5th 65, 77–78.) Nevertheless, because the parties and amici curiae have fully briefed the issue, and it is undoubtedly one of statewide importance, we now consider whether public employers like AHS are subject to PAGA penalties.

The civil penalties recoverable under PAGA fall into two categories. If a Labor Code provision "provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments," PAGA authorizes aggrieved employees to sue for those penalties on behalf of themselves and other employees so aggrieved. (§ 2699, subd. (a).) Many Labor Code statutes, however, do not establish a penalty for their violation. In addition to creating a right of action for aggrieved employees to recover defined penalties, PAGA created a new default penalty when no penalty had previously been provided. (See *ZB*, *supra*, 8 Cal.5th at p. 185; *Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 216.) For any "person" with one or more employees, this default penalty is set at $100 for the initial violation against each aggrieved employee, per pay period, and $200 for each subsequent violation. (§ 2699, former

subd. (f)(2).)[20]   Significantly, for our purposes, PAGA specifies that the term " 'person' has the same meaning as defined in Section 18." (§ 2699, subd. (b).)[21]   As discussed, when a Labor Code statute expressly references section 18's definition, public employers are not included unless otherwise specified. (See *ante*, at pp. 9–11; see also *Sargent v. Board of Trustees of California State University* (2021) 61 Cal.App.5th 658, 672–673 (*Sargent*).)

The Court of Appeal acknowledged that AHS is "a public entity of some sort" and agreed that, based on section 18's definition, it is therefore "not a 'person' for purposes of PAGA." (*Stone, supra*, 88 Cal.App.5th at p. 98.) Because section 2699, subdivision (f) clearly frames liability in terms of a "person," the court concluded AHS is not subject to default penalties under

---

[20]   The full text of the former subdivision states: "For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows:  [¶] (1) If, at the time of the alleged violation, the *person* does not employ one or more employees, the civil penalty is five hundred dollars ($500). [¶] (2) If, at the time of the alleged violation, the *person* employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation. [¶] (3) If the alleged violation is a failure to act by the Labor and Workplace Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, there shall be no civil penalty." (§ 2699, former subd. (f), italics added.) The amended statute continues to use the word "person" in defining the parties subject to default penalties. (See § 2699, subd. (f).)

[21]   Section 2699, subdivision (b) was not altered by the recent amendments.

STONE v. ALAMEDA HEALTH SYSTEM
Opinion of the Court by Corrigan, J.

this provision. We agree. But the court posited that *non*default penalties are different. Under its reading of section 2699, the requirement that an employer be a "person" applies *only* to subdivision (f)'s default penalties and "does *not* apply to those statutory violations 'for which a civil penalty is specifically provided.' " (*Stone*, at p. 98.) Accordingly, despite AHS's status as a public entity, the court concluded AHS is subject to PAGA claims arising from statutes that impose defined penalties. (*Stone,* at p. 98.)

Although the Court of Appeal cited no authority for this reading of section 2699, it appears to have been influenced by *Sargent, supra*, 61 Cal.App.5th 658. *Sargent* also distinguished between PAGA claims for defined and default penalties. It observed that section 2699, subdivision (a), unlike subdivision (f), does not include the word "person." (*Sargent*, at p. 671.) Based on the plain language of subdivision (a), in particular its failure to reference section 18's definition of "person," *Sargent* held "*any* employer that is subject to a civil penalty assessed and collected by the Labor [and Workforce Development] Agency is subject to PAGA." (*Sargent*, at p. 671, italics added.) The dichotomy recognized by *Sargent* and the Court of Appeal carries obvious significance for public employers, which would potentially be subject to PAGA suits for specified penalties under Labor Code provisions that apply to them. On close examination, however, this interpretation appears inconsistent with legislative intent and could lead to absurd results. It also runs counter to the policy underlying Government Code section 818, which shields public entities from punitive sanctions.

Turning to the relevant text, PAGA's general provision states: "Notwithstanding any other provision of law, any

provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3." (§ 2699, former subd. (a).) This subdivision addresses only *who* can recover civil penalties (aggrieved employees) and *how* they may do so (through a representative action conducted pursuant to section 2699.3). It does not speak to the identity of *defendants* against whom such an action may be brought.[22] While *Sargent* construed this silence as an intent to authorize PAGA suits against all employers, including the government, that construction reads too much into legislative silence and is contrary to the statute read in its entirety.

Although section 2699, subdivision (a) does not describe the types of employers subject to suit, other provisions of the PAGA statute do. The very next subdivision states that, "[f]or

---

[22] The newly amended version of this subdivision continues to describe only the parties who may bring a PAGA suit. It states: "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of the employee and other current or former employees against whom a violation of the same provision was committed pursuant to the procedures specified in Section 2699.3." (§ 2699, subd. (a).)

purposes of this part," meaning *all* PAGA statutes in part 13 of the Labor Code (§§ 2698–2699.8), " 'person' has the same meaning as defined in Section 18." (§ 2699, subd. (b).) Following this definition, subdivision (f) sets out the default penalties aggrieved employees may collect depending on how many people the "person" employs. (*Id.*, subd. (f)(1)–(2).) And subdivision (*l*) prohibits aggrieved employees from suing for PAGA penalties, of either type, when the LWDA "cites a *person* within the timeframes set forth in Section 2699.3 for a violation of the same section or sections of the Labor Code under which the aggrieved employee is attempting to recover." (§ 2699, subd. (*l*), italics added [formerly § 2699, subd. (h)].)[23]

Legislative history demonstrates that the choice to use section 18's definition of "person" was intentional. When the bill to enact PAGA was amended to include references to "persons" subject to default penalties (Sen. Bill No. 796 (2003–2004 Reg. Sess.), as amended Mar. 26, 2003, § 2), legislative staff observed that the bill included no definition of this term. A bill analysis pointed out that "person" has different meanings in various parts of the Labor Code, and it encouraged the bill's author "to add a definition of 'person' specifically applicable to" PAGA. (Sen. Com. on Labor & Industrial Relations, Analysis of Sen. Bill. No. 796 (2003–2004 Reg. Sess.) as amended Mar. 26, 2023,

---

[23] The provisions of section 2699, former subdivision (h) now appear in section 2699, subdivision (*l*). They are unchanged in any significant respect. We note that the word "person" also appears in the definition of who can sue. (See § 2699, subd. (c)(1).) Section 18's definition of "person" can refer both to individual employees and the organizations that employ them. No party contends the use of "person" in section 2699, subdivision (c) has significance for the issues here, and we do not consider it further.

p. 5.) Less than a month later, the bill was amended to incorporate the section 18 definition. (Sen. Amend. to Sen. Bill No. 796 (2003–2004 Reg. Sess.) Apr. 22, 2003, § 2.) In light of this choice, it is difficult to conceive that by *failing to mention* employers at all in section 2699, subdivision (a), the Legislature intended to import a broader definition and expand PAGA to public employers *sub silentio.*

Moreover, nothing in the statutory text suggests the Legislature intended to subject public employers to some types of PAGA penalties but not others. Nor has any party suggested why it might have done so. Indeed, the Court of Appeal's reading has problematic consequences when applied to the statute's provision barring duplicate actions. As noted, section 2699, subdivision (*l*) prohibits aggrieved employees from suing under PAGA if the LWDA "cites a *person*" for violating the same Labor Code provisions at issue. (Italics added.) Because PAGA's definition of "person" does not include public employers (§ 2699, subd. (b); see § 18), subdivision (*l*)'s ban on duplicate actions protects only private employers. This result makes sense if public employers are not subject to PAGA penalties in the first place. But a potential absurdity arises if, as the Court of Appeal ruled, public employers are subject to PAGA suits for penalties defined in specific Labor Code statutes. The subdivision would protect private employers from duplicative PAGA actions for these penalties but would not extend the same protection to public employers. No reason for such a distinction has been suggested by the parties or amici curiae, and none appears in the legislative history of PAGA. On the contrary, committee reports stated that "*no* private action may be brought when the LWDA or any of its subdivisions initiates proceedings to collect penalties on the same facts and under the same code

provisions." (Sen. Judiciary Com., Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended Apr. 22, 2003, p. 8, italics added; see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended May 12, 2003, p. 2.) The distinction would be particularly difficult to justify given that state and local taxpayers are the ultimate source of recoveries obtained from public employers. (See *post*, at pp. 57–59.)[24]

Countering this view, amicus curiae CELA points to section 2699, subdivision (f)(3). This provision, which appears in the portion of section 2699 that defines default penalties, states: "If the alleged violation is a failure to act by the [LWDA], or any of its departments, divisions, commissions, boards, agencies, or employees, there shall be no civil penalty." (§ 2699, subd. (f)(3).) Advocating a broader reading than that reached by the Court of Appeal, or any published decision, CELA argues this provision shows the Legislature intended to subject public employers to *all* PAGA penalties, because otherwise there would have been no reason for it to specify that the LWDA, a public agency, was excluded. The argument falters. In enacting PAGA, the Legislature was well aware of the staffing and budgetary constraints that hindered the LWDA's ability to investigate labor violations and enforce penalties. (See *Kim*,

---

[24] Other provisions appear to prevent duplicate actions. Specifically, section 2699.3 dictates that an aggrieved employee's action for PAGA penalties "shall commence only after" the LWDA has been given notice of the alleged violation and has declined to investigate or to issue a citation. (§ 2699.3, subd. (a); see also § 2699, subd. (a) [describing PAGA "as an alternative" to enforcement by the LWDA].) Our point in discussing section 2699, subdivision (*l*) is merely to note the incongruity created by the Court of Appeal's interpretation.

*supra*, 9 Cal.5th at p. 86; see also Sen. Com. on Labor & Industrial Relations, Analysis of Sen. Bill. No. 796 (2003–2004 Reg. Sess.) as amended Mar. 26, 2023, p. 4.) Even so, the PAGA statutes impose some additional obligations on the LWDA. (See, e.g., §§ 2699.3, former subds. (a)(2), (c).) In enacting subdivision (f)(3), the Legislature evidently sought to avoid the absurd result of subjecting the agency to penalties for failing to uphold its Labor Code obligations as an *investigating entity*, rather than as an employer itself. (See, e.g., Sen. Rules Com., Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended Sept. 2, 2003, p. 3 [explaining "civil penalties do not apply if the alleged violation is a failure to act by the LWDA or any of its subdivisions"].) The express LWDA exemption from default penalties cannot reasonably be read as an authorization to impose nondefault penalties on all other public employers.

CELA's related argument regarding a provision of the California Occupational Safety and Health Act of 1973 (Cal/OSHA; § 6300 et seq.) fares no better. Cal/OSHA expressly applies to public employers (§ 6304; see § 3300) and authorizes civil penalties for violations (§ 6423 et seq.; see Stats. 1999, ch. 615, § 5, pp. 4339–4340 [repealing prior law's prohibition against penalties being assessed against certain public employers]). Within this context, section 6434.5 requires that penalties assessed against police or fire departments be deposited into the Workers' Compensation Administration Revolving Fund. It also provides that these penalties may be *refunded* if the department has abated all violations and has not been cited for new violations in the past two years. (§ 6434.5, subds. (a)–(b).) If funds received as a penalty are not refunded, they are allocated to the California Firefighter Joint Apprenticeship Program or the Office of Criminal Justice

Planning. (*Id.*, subd. (b).) The final subdivision of the statute states: "This section does not apply to that portion of any civil or administrative penalty that is distributed directly to an aggrieved employee or employees pursuant to the provisions of Section 2699." (*Id.*, subd. (c).) CELA asserts this subdivision reflects a legislative belief that police and fire departments are subject to PAGA penalties; otherwise, the exception would have been unnecessary. But the Legislature's intent in adding section 6434.5, subdivision (c) is far from clear. The purpose of the statute was to establish a refund and allocation program for police and fire departments similar to one that had been established for public school districts. (See Assem. Com. on Labor & Employment, Analysis of Assem. Bill No. 186 (2005–2006 Reg. Sess.) as introduced Jan. 25, 2005, pp. 2–3.) But the statute pertaining to public schools includes no carveout for PAGA penalties (see § 6434), and legislative history includes no explanation for why such an exception was added to section 6434.5. The Legislature may have simply wanted to make clear that, unlike Cal/OSHA penalties, the penalties awarded to aggrieved employees under PAGA are never subject to refund. Regardless, we cannot assume the Legislature intended to extend PAGA to public employers by negative implication in an unrelated statute. " '[A]n intention to legislate by implication is not to be presumed.' " (*In re Christian S.* (1994) 7 Cal.4th 768, 776.)

Because the scope of PAGA's application is unclear from the text of section 2699 alone, it is appropriate to consult extrinsic sources. A conclusion that public employers are not subject to PAGA penalties is most consistent with the statute's legislative history. The Legislature declared that PAGA's purpose was to "achieve maximum compliance with state labor

laws *in the underground economy* and to ensure an effective disincentive for employers to engage in unlawful and *anticompetitive business practices*." (Stats. 2003, ch. 906, § 1, subd. (a), p. 6629, italics added.) Committee reports extensively discuss the difficulties state authorities had encountered enforcing labor laws in California's "underground economy." (See, e.g., Sen. Judiciary Com., Analysis of Sen. Bill No. 796, *supra*, as amended Apr. 22, 2003, pp. 2, 4; Sen. Rules Com., Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended May 12, 2003, p. 4; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 796, *supra*, as amended May 12, 2003, p. 3; Assem. Com. on Labor & Employment, Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended Jul. 2, 2003, p. 3.) The Legislature was also motivated by a United States Department of Labor study documenting widespread wage violations in the Los Angeles garment industry. (See Sen. Judiciary Com., Analysis of Sen. Bill No. 796, p. 2; Sen. Rules Com., Analysis of Sen. Bill No. 796, p. 4; Assem. Com. on Labor & Employment, Analysis of Sen. Bill No. 796, p. 3.) Public entity employers like AHS are not part of an "industry" or "underground economy."

Moreover, the legislators who enacted PAGA sought to avoid abuses of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.) that had recently come to light. (See Sen. Judiciary Com., Analysis of Sen. Bill No. 796, *supra*, as amended Apr. 22, 2003, p. 7; Assem. Com. on Labor & Employment, Analysis of Sen. Bill No. 796, *supra*, as amended Jul. 2, 2003, p. 6.) They crafted an "aggrieved employee" standing requirement to avoid the problem of so-called shakedown lawsuits by UCL plaintiffs who had suffered no actual injuries. (*Kim*, *supra*, 9 Cal.5th at p. 90.) The Legislature enacting PAGA would have been aware of longstanding case law holding that

"government entities are not 'persons' who may be sued under the UCL" (*Wells, supra,* 39 Cal.4th at p. 1203; see *Leider v. Lewis* (2017) 2 Cal.5th 1121, 1132, fn. 9.) Within this context, it would have been anomalous for the Legislature to subject government entities to a broad range of civil penalties without making this intent clear anywhere in the text or legislative history of PAGA.

Finally, the *only* fiscal effect of PAGA identified by the Assembly Appropriations Committee was "potential increased penalty revenue to the [general fund] and to LWDA." (Sen. Rules Com., Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended Sept. 2, 2003, p. 5.) If government employers were subject to civil penalties under PAGA, it seems likely the Legislature would have also noted the potential *costs* these employers would incur if penalized. The omission of any mention of costs points to a lack of intent to impose PAGA penalties on public employers.[25]

---

[25] As a counterpoint, CELA points to the assertion in an Assembly Republican analysis that PAGA "likely would result in major costs to state and local employers to defend lawsuits and pay increased penalties and attorneys' fees." (Assem. Republican Caucus, Labor & Employment Com., Analysis of Sen. Bill No. 796 (2003–2004 Reg. Sess.) as amended Sept. 2, 2003, p. 48.) The same analysis reflects that, with a single exception, Assembly and Senate Republicans opposed the bill to enact PAGA. (Assem. Republican Caucus, at p. 46.) Even assuming the quoted statement was meant to refer to state and local *government* employers, it is settled that "the views of [a] bill's opponents found in committee and floor analyses . . . shed little light on the *Legislature*'s intent, which is the focus of our analysis." (*Los Angeles Unified School Dist. v. Superior Court* (2023) 14 Cal.5th 758, 782 (*Los Angeles Unified*); see *American*

The costs public entities could incur if subject to PAGA suits are potentially quite large. In addition to penalties, which can be sizable in cases involving numerous employees or lengthy time periods, PAGA provides for one-way fee-shifting. With minor exceptions, aggrieved employees who prevail in a PAGA action are entitled to recover "reasonable attorney's fees and costs." (§ 2699, subd. (k)(1).) Attorney fees in these complex suits can be substantial. In *Sargent*, for example, the trial court ordered California State University to pay $2,905,200 in PAGA penalties for asserted Labor Code violations and a total of $7,793,030 in attorney fees. (*Sargent*, *supra*, 61 Cal.App.5th at p. 666.) Although the Court of Appeal struck the PAGA penalties after concluding that public entities are not subject to default penalties (*id.* at pp. 674–675), it upheld the attorney fee award (*id.* at p. 675). While subjecting public entities to civil penalties might serve PAGA's goal of augmenting the LWDA's enforcement of the Labor Code (see *Kim*, *supra*, 9 Cal.5th at

_____

*Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1264; *Tan v. Appellate Division of Superior Court* (2022) 76 Cal.App.5th 130, 140.) A partisan bill analysis does not provide insight into the views of the Legislature as a whole. (*That v. Alders Maintenance Assn.* (2012) 206 Cal.App.4th 1419, 1428, fn. 9.) Nor is it significant, for our purposes, that some public employee unions supported the passage of Senate Bill No. 796. As with the views of opponents, views held by a bill's supporters are not evidence of the *Legislature's* intent. (See *Los Angeles Unified*, at p. 783; *Metropolitan Water Dist. of Southern California v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1426.) Individuals and organizations frequently support legislation that does not directly benefit them. The Sierra Club also supported PAGA (see Assem. Com. On Labor & Employment, Analysis of Sen. Bill No. 796, *supra*, as amended Jul. 2, 2003, p. 8), for example, but that does not make it an environmental statute.

p. 83; Stats. 2003, ch. 906, § 1, p. 6629), the result would simply rob Peter to pay Paul. Even though 75 percent of penalties recovered would go to the LWDA for its enforcement efforts, those penalties would be paid from the coffers of other taxpayer-funded public institutions.[26]

We addressed a similar issue in *Wells* regarding the False Claims Act. As with PAGA, a false claims action can be initiated by a government authority or by a qui tam plaintiff acting on behalf of the state. (Gov. Code, § 12652, subd. (c)(1); *Wells, supra,* 39 Cal.4th at p. 1188.) A party found liable may be required to pay treble damages, costs of suit, and a civil penalty of up to $11,000 per violation. (Gov. Code, § 12651, subd. (a); *Wells,* at p. 1187.) The prosecuting authority or qui tam plaintiff may recover up to 50 percent of any such recovery. (Gov. Code, § 12652, subd. (g); *Wells,* at pp. 1188–1189.) *Wells* concluded the consequences of exposing public school districts to liability in such cases would be dramatic, interfering with their ability to provide free public education as mandated by the Constitution. (*Wells,* at p. 1193.) We observed: "The Legislature is aware of the stringent revenue, budget, and appropriations limitations affecting all agencies of government — and public school districts in particular. Given these conditions, we cannot lightly presume an intent to force such entities not only to make whole the fellow agencies they defrauded, but also to pay huge additional amounts, often into the pockets of outside parties. Such a diversion of limited taxpayer funds would interfere significantly with government agencies' fiscal ability to carry

---

[26] For example, amicus curiae California State University asserts that unfunded PAGA liability is one reason for a recent tuition increase affecting all students.

out their public missions." (*Wells*, at pp. 1195–1196.) The same concerns are at play here. An entity found liable for PAGA penalties would have to pay not only the costs of suit, but also the prevailing plaintiff's attorney fees. (§ 2699, subd. (k)(1).) And, unlike the False Claims Act, there is *no* statutory ceiling on the amount of PAGA penalties an entity could be required to pay. The drain on public funds that could result from exposing public employers to PAGA penalties is perhaps even greater than the prospect we considered in *Wells*.

The parties debate whether exposing public entities to PAGA penalties would be consistent with the policy underlying Government Code section 818. That provision, enacted as part of the Government Claims Act, "was intended to limit the state's waiver of sovereign immunity and . . . its exposure to liability for actual compensatory damages in tort cases." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 146 (*Kizer*), disapproved on other grounds in *Los Angeles Unified School Dist. v. Superior Court*, *supra*, 14 Cal.5th at p. 775.) It mandates: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."[27] (Gov. Code, § 818.) A sanction need not be "simply" or "solely" punitive to run afoul of Government Code section 818. (*Los Angeles Unified*, at p. 775; see *id.* at pp. 775–776.) Rather, "the ultimate question" is "whether, by virtue of being imposed 'primarily for the sake of example and by way of punishing the defendant'

---

[27] Civil Code section 3294 provides for punitive damages upon clear and convincing proof the defendant acted with "oppression, fraud, or malice." (*Id.*, subd. (a).)

([Gov. Code,] § 818), the damages before the court function, in essence, as a form of punitive or exemplary damages." (*Id.* at p. 773.)

We explained in *Kim* that PAGA penalties "are intended to 'remediate present violations and deter future ones,' *not* to redress employees' injuries." (*Kim*, *supra*, 9 Cal.5th at p. 86.) The penalties "are thus calculated ' "to punish the employer" for wrongdoing' [citation] and ' "to deter violations" ' [citation] rather than 'compensate employees for actual losses incurred.' " (*Adolph*, *supra*, 14 Cal.5th at p. 1117.) We have compared PAGA penalties to punitive damages, noting that, " ' "like punitive damages, [they] are intended to punish the wrongdoer and to deter future misconduct." [Citation.] An act may be wrongful and subject to civil penalties even if it does not result in injury.' " (*Kim*, at p. 86, quoting *Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 681.) Most recently, in addressing penalties under section 226 for wage statement violations, we observed that "the purpose of imposing civil penalties is typically, as with punitive damages, not primarily to compensate, but to deter and punish." (*Naranjo v. Spectrum Security Services, Inc.* (2024) 15 Cal.5th 1056, 1075.) The Court of Appeal reached a contrary conclusion. It reasoned that the primary purpose of PAGA penalties is not to punish, but rather to secure compliance with labor statutes and regulations by providing an " 'economic incentive' " for plaintiffs "and 'the means to retain counsel to pursue perpetrators.' " (*Stone*, *supra*, 88 Cal.App.5th at p. 99.)

AHS does not contend that imposing PAGA penalties on public entities is *prohibited* by Government Code section 818, and we do not decide that question. Instead, AHS contends PAGA should be interpreted to avoid a potential conflict with

section 818. We agree that policy concerns similar to those animating the Government Code statute are implicated here. "Section 818 . . . manifests an appreciation that when additional impositions upon a public entity are 'primarily for the sake of example and by way of punishing the defendant' (*ibid.*), they further drain the public fisc, create a liability that will be borne not by the immediate wrongdoers but by taxpayers, and may not effectively achieve the goals of retribution and deterrence — and for these reasons, such awards should not be permitted, at least without a clear indication by the Legislature that they may be imposed." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 770.) Requiring public entities to pay PAGA penalties would pose similar difficulties. "[T]he purpose behind the statutory ban on punitive damages against public entities — to protect their tax-funded revenues from legal judgments in amounts beyond those strictly necessary to recompense the injured party — applies equally here." (*Wells*, *supra*, 39 Cal.4th at p. 1196, fn. 20.) Considering this policy, and the longstanding recognition that "civil penalties may have a punitive or deterrent aspect" (*Kizer*, *supra*, 53 Cal.3d at p. 147), we would expect the Legislature to have more clearly communicated any intention to impose PAGA penalties on public employers. It has not done so.

Accordingly, based on the statutory text, legislative history, and public policy, we conclude public entity employers are not subject to PAGA suits for civil penalties.[28] If the Legislature intends otherwise, it is of course free to amend the

---

[28] The contrary holding of *Sargent v. Board of Trustees of California State University, supra,* 61 Cal.App.5th 658 regarding nondefault penalties under section 2699, subdivision (a) is disapproved.

relevant statutes or pass new legislation to provide for a different result.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed. The Court of Appeal is directed to remand the matter to the trial court with directions to reinstate its ruling on the demurrer and conduct any further proceedings the court deems appropriate. (See, e.g., *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747.)

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**SEGAL, J.***

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Stone v. Alameda Health System

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 88 Cal.App.5th 84
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S279137
**Date Filed:** August 15, 2024

---

**Court:**  Superior
**County:**  Alameda
**Judge:**  Noel Wise

---

**Counsel:**

Law Offices of David Y. Imai and David Y. Imai for Plaintiffs and Appellants.

Stiller Law Firm, Ari J. Stiller; Collier Socks, Dustin L. Collier; Pine Tillett and Scott Tillett for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Teague Patterson and Gillian Santos for the American Federation of State, County and Municipal Employees as Amicus Curiae on behalf of Plaintiffs and Appellants.

Renne Public Law Group, Ryan P. McGinley-Stempel, Amy Ackerman, Arthur A. Hartinger, Geoffrey Spellberg, Sam Wheeler, M. Abigail West and Anastasia Bondarchuk for Defendant and Respondent.

Complex Appellate Litigation Group and Jens B. Koepke for the Board of Trustees of the California State University as Amicus Curiae on behalf of Defendant and Respondent.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Pamela K. Graham for the California Association of Joint Powers Authorities, California Special Districts Association, California State Association of Counties and the League of California Cities as Amici Curiae on behalf of Defendant and Respondent.

Liebert Cassidy Whitmore, Brian P. Walter and Alex Y. Wong for Kern County Hospital Authority as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David Y. Imai
Law Offices of David Y. Imai
311 Bonita Drive
Aptos, CA 95003
(831) 662-1706

Scott Tillett
Pine Tillett LLP
14156 Magnolia Boulevard, Suite 200
Sherman Oaks, CA 91423
(818) 379-9710

Ryan P. McGinley-Stempel
Renne Public Law Group
350 Sansome Street, Suite 300
San Francisco, CA 94104
(415) 848-7250